**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| Cynthia Rollo-Carlson, and | ) | Civil Action |
| Douglas Carlson | ) | |
| Plaintiffs | ) | Case No. _____ |
| | ) | |
| v. | ) | Demand for Jury Trial |
| | ) | Yes ___        No _x_ |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant | ) | |

## COMPLAINT

## I.    PRELIMINARY STATEMENT

1.      Cynthia Rollo-Carlson and Douglas brings this Federal Tort Claims Act suit for the wrongful death of her son, Jeremiah Flackus-Carlson.  Mr. Flackus-Carlson was diagnosed with Post Traumatic Stress Disorder after experiencing a sexual assault while enlisted in the US Army and stationed in Korea.  Post military discharge, Mr. Flackus-Carlson was treated by the St. Cloud, Veterans Affairs Medical Center (hereinafter "St. Cloud VAMC").  The St. Cloud VAMC was aware that Mr. Flackus-Carlson was a high risk for committing suicide by drug overdose.  However, the St. Cloud, VAMC was negligent in its failure to render proper care. Because of the St. Cloud VAMC's negligence Mr. Flackus-Carlson died at his own hand by drug overdose.

## II.    Parties

2.      Plaintiffs reside at 6379 Wedgewood Rd. NW, Walker, Minnesota 56484.

3.      The Department of Veterans Affairs is an agency of the United States of America.

4.      The Defendant is the United States of America.

### III.    Jurisdiction and Venue

5.     This Court has jurisdiction of this cause pursuant to 28 U.S.C. §1346(b).

6.     The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Plaintiffs Original Complaint on Gregory G. Brooker by certified mail, return receipt requested at his office, United States Attorney, District of Minnesota, at U.S. Courthouse, 316 N. Robert Street, Suite 404, St. Paul, Minnesota, 55101.

7.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of events or omissions giving rise to this claim occurred in this district.

8.     Title 28 U.S.C. §§2671-2680, commonly called the "Federal Tort Claims Act," allows for the commencement and prosecution of claims against the United States of America. Liability of the United States is predicated on Title 28 U.S.C. §§1346(b)(1) and 2674 because the wrongful death of Jeremiah Flackus-Carlson was proximately caused by the negligence, wrongful acts, and/or omissions for employees of the St. Cloud VAMC while acting within the scope of their employment or office under circumstances where the United States of America would be liable to Plaintiffs in the same extent and manner if the tort was committed by an individual.

9.     Pursuant to Title 28 U.S.C. §§2672 and 2675(a), Plaintiffs plead that the claims made herein were filed with and presented administratively to the Defendant's agency, the Department of Veterans Affairs, on September 5, 2017.

10.     The Department of Veterans Affairs, Office of General Counsel, acknowledged the September 5, 2017 receipt of the Standard Form 95 for Jeremiah Flackus-Carlson by letter to Plaintiffs' attorney on October 19, 2017.

11.    By March 5, 2018, the Plaintiffs claims were not answered by Defendant and thus deemed denied.

12.    Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions required prior to commencement and prosecution of this litigation.

## IV.    FACTS

13.    The United States of America, through its agency, the Department of Veterans Affairs, at all times material to this claim, owned, operated, and controlled the health care facility known as the St. Cloud VAMC.

14.    Though its agency, the Department of Veterans Affairs, staffed said healthcare facilities with its agents, servants, and/or employees.

15.    At all times material to this matter, all persons involved in the medical and healthcare services provided to Jeremiah Flackus-Carlson at the St. Cloud VAMC were agents, servants, and/or employees of the Department of Veterans Affairs, the United States of America, or some other agency thereof, and were at all times material to this matter, acting within the course and scope of such employment.

16.    This is a Federal Tort Claims Action seeking monetary damages for the wrongful death of Jeremiah Flackus-Carlson which resulted from Defendants negligent psychiatric care and inaction.

17.    Cynthia Rollo-Carlson is the biological mother of Mr. Flackus-Carlson and his next of kin.

18.    Douglas Carlson is the adoptive father of Mr. Flackus-Carlson and his next-of-kin.

19.     Mr. Flackus-Carlson was a twenty-five-year-old male when he first had contact with the Department of Veterans Affairs.

20.     He was seen by Leesa Scott-Morrow, Ph.D., J.D., on February 5, 2013, as part of his evaluation of his Department of Veterans Affairs Compensation Claim.

21.     Dr. Scott-Morrow diagnosed Mr. Flackus-Carlson with:

      A.     Major Depressive Disorder, recurrent, severe, without psychotic features.

      B.     Post Traumatic Stress Disorder (hereinafter "PSTD")

22.     Dr. Scott-Morrow also documented that Mr. Flackus-Carlson was sexually assaulted while stationed in Korea with the US Army.   Specifically, Mr. Flackus-Carlson reported to Dr. Scott-Morrow that he was raped by a man that he did not know in a bathroom stall at a bar.

23.     Dr. Scott-Morrow also noted that Mr. Flackus-Carlson's significantly worsened shortly after his return from Korea.

24.     For example, shortly after his arrival at Fort Carson Mr. Flackus-Carlson became overwhelmed and drove his truck to Mexico after a bout of drinking.

25.     He subsequently called his chain of command and reported that he was thinking of killing himself.   Mr. Flackus-Carlson was subsequently evaluated by psychiatric services off the post.

26.     There, Mr. Flackus-Carlson disclosed his sexual assault while he was hospitalized for six weeks.

27.     Dr. Scott-Morrow noted that Mr. Flackus-Carlson's prognosis was good if he remained in extended care.

28.     Mr. Flackus-Carlson was brought to the Emergency Department of the Hilo Medical Center, Hawaii, on January 1, 2014, for ingestion of nine (9) tablets of Risperdal (an antipsychotic). Upon medical stabilization, Mr. Flackus–Carlson was admitted to inpatient psychiatry at Hilo Medical Center. In the discharge summary, Dr. Denis Lee, M.D. did not diagnose Mr. Flackus-Carlson with schizophrenia.

29.     Instead, Dr. Lee diagnosed Mr. Flackus-Carlson with: Major Depressive Disorder, recurrent, severe, without psychotic features, Alcohol Abuse, and Cannabis Abuse.

30.     On March 7, 2014, the Fargo VA Medical Center placed a Category I High Risk for Suicide flag on Mr. Flackus-Carlson due to suicidal ideations in accordance with Veterans Health Administration policy.

31.     Mr. Flackus-Carlson was admitted to the Minneapolis Veterans Affairs Health Care System (hereinafter "Minneapolis VA") on August 11, 2014 for Suicidal Ideations and was placed on a 72 hour hold in their inpatient psychiatric unit.

32.     On September 3, 2014, a Social Worker in the Suicide Prevention Program at the Minneapolis VA noted that Mr. Flackus-Carlson had been "assigned a Category I High Risk for Suicide flag …."

33.     The High Risk for Suicide Flag was noted when Mr. Flackus-Carlson was seen and discharged from the Emergency Room at the Minneapolis VA for suicidal thoughts.

34.     On September 16, 2014, Mr. Flackus-Carlson was admitted to the Fargo VA Medical Center psychiatry unit because he was not stable on outpatient treatment.

35.     On October 27, 2014, Mr. Flackus-Carlson was screened for eligibility for the Residential Rehabilitation Treatment Program (hereinafter "RRTP") at the St. Cloud VAMC.

36.     Nurse Angela M. Lahr, RN, BSN, quoted Mr. Flackus-Carlson as saying: "anxiety and depression. My therapist and I have been going over stuff. I have delusions. Like an inflated sense of self or something, I think I'm going to be a famous person. I would have to explain it forever. I agree though with the therapist. They're not realistic thoughts."

37.     On October 31, 2014, he was admitted to the RRTP at the St. Cloud VAMC.

38.     Also on October 31, 2014, a Suicide Safety Plan was authored by Andrea Fuchs, RN, BSN.

39.     In that plan, Mr. Flackus-Carlson was quoted as saying: "An increase in my use of alcohol. Isolating myself, My arms (legs, body) feeling "heavy." Sleeplessness or sleeping too much, Thinking that I just can't cope, Staying in bed all day, Abusing substances, Staring at a single thing, or at nothing for long periods of time, Pacing, feeling restless, acting "fidgety", Worrying a lot about one thing, Worrying a lot about everything, Neglecting personal appearance (not bathing, brushing my teeth, doing laundry/wearing clean clothes etc), Not communicating with friends or family (not answering the doorbell or phone, failing to return emails etc), Automatic thoughts…"

40.     On November 3, 2014, Mr. Flackus-Carlson was evaluated for an initial bio-psychological assessment by Brad M. Brunick, PsyD, LP.

41.     In Dr. Brunick's report, he opined that Mr. Flackus-Carlson suffered from a high level of anxiety and documented "there was no evidence of auditory or visual hallucinations or delusions."

*42.*     Dr. Brunick further noted that Mr. Flackus-Carlson was "struggling with depressed mood, anxiety and feeling paranoid, in addition to thoughts about being the 'chosen one' and 'the most religiously charismatic person' make it hard to concentrate."

*43.*    Dr. Brunick reported that Mr. Flackus-Carlson was suffering from Depressed Mood, Sadness, Anhedonia, Decreased Appetite, Erratic Sleep, Loss of Energy, Worthlessness, Hopelessness, Decreased Attention, Concentration, Anxiety, "Frequent Difficult to Control Worry," Restlessness, Fatigue, "Frequent Re-Experiencing Memories of Unwanted Sexual Experiences," Attempts at Avoidance, Thought Suppression, Exaggerated Startle Response, Nightmares, Avoidance of Crowds.

44.    Dr. Brunick further observed: "He appeared restless and described having 'all these extraordinary thoughts go thru [sic] my head' that suggest he should be doing something special with his life and at times believing 'the music I hear is about me…He endorsed having periods of very little sleep for as many as four days yet acknowledged they mostly involve substance use. He noted having episodes 'every couple weeks when I am lying down, and I can't move' and will hear 'sounds' that are 'grumbling like evil voices' yet they are 'not words.'"

45.    Dr. Brunick also reported that Mr. Flackus-Carlson reported having 5 or 6 psychiatric hospitalizations for suicidal ideation.

46.    Dr. Brunick further recorded that Mr. Flackus-Carlson had been drinking since he was an adolescent, began experimenting with marijuana at age 13, and experimented with mushrooms and oxycontin at age 21.

47.    Mr. Flackus-Carlson also reported he occasionally used marijuana and recently relapsed on alcohol after a two month period of sobriety due to nervousness.

48.    But, Dr. Brunick also noted habitual and heavy consumption of nicotine and caffeine.

49.    During this assessment, Mr. Flackus-Carlson again disclosed a history of Military Sexual Trauma (hereinafter "MST").

50.     The Department of Veterans Affairs is mandated to operate a mental health treatment program for veterans to overcome psychological trauma resulting from MST occurring in the course of the veteran's military service pursuant to 38 U.S.C. §1720D.

51.     Also recorded was that just prior to admission, Mr. Flackus-Carlson had been charged with his third Driving Under the Influence offense.

52.     The next day, November 4, 2014, the results of a urine drug test was reported. The test was positive for Benzodiazepines and sub-threshold Cannabis.

53.     Jason Pierskala, RN, CNP, noted that Mr. Flackus-Carlson was never prescribed Benzodiazepines.

54.     There is no record that any member of the St. Cloud VAMC treatment team confronted Mr. Flackus-Carlson about why Benzodiazepines were in his system.

55.     Dr. Shashi Prakash acknowledged receipt of the positive drug screen on November 18, 2014.

56.     On November 6, 2014, an Initial Interdisciplinary Mental Health Treatment Plan (hereinafter "Treatment Plan"), was drafted and endorsed by the whole treatment team.

57.     However, despite the full involvement of all treatment team members, several critical areas of the treatment plan were left blank.

58.     In the treatment plan, the following risk factors were noted. Specifically, the risk factors identified "Suicidal Ideation, Substance Abuse / Dependence Relapse, and Overdose."

59.     On November 14, 2014, Mr. Flackus-Carlson and the Plaintiff met with Crystal Fritzar MSW, LICSW.

60.     In that meeting, Mr. Flackus-Carlson reported he had a 'tape' running in his head for the last two years.

61.     Mr. Flackus Carlson was quoted as saying, "Something big is going to happen, and I am going to be the person that everyone turns to," He also said, "That I am a very, very influential person and everyone will be coming to me."

62.     The Plaintiff, and Mr. Flackus-Carlson, expressed concerns about his housing situation.  In particular, they both were concerned that living alone in the community would lead to social isolation and a worsening of Mr. Flackus-Carlson's mental health.

63.     That note reads: "Both this veteran and his mother believe it is important that this veteran not live alone when he leaves programming. This veteran's mother further shared that she and her husband will be leaving the state for 6 months while this veteran is in programming and she does not want this veteran in Walker, MN (their hometown) due to how isolated it is. She shared that she believes this veteran would benefit from a program where the staff is available round the clock as this veteran has had 'breakdowns' at all times of the day."

64.     On November 19, 2014, Jamie L. Carpenter (a student psychiatric mental health nurse practitioner) noted that: "[h]e continues to express concerns with visions and premonitions of what is 'supposed to happen' and what he is supposed to do with his life and that, 'I am the chosen one, people think I am Jesus…'"

65.     The same report recorded that "[v]eteran reports feeling that he is special, or rather given special privileges, but does not want this responsibility…Veteran currently reports depressed mood, anhedonia, disturbed sleep – sleeping too much some days or getting no sleep for a couple of days. Reports fragmented sleep where he will go to bed at midnight and wake up at 3:30 am and be up for the day. Reports he will fall asleep in class (RRTP programming) … Has been smoking cannabis since 13 years old explaining that he doesn't smoke 'all the time' as it makes him paranoid if he uses too much…."

66.     Ms. Carpenter's note was cosigned on November 20, 2014, by Susan Sawyer-Demaris, CNP.

67.     Ms. Carpenter reported that Mr. Flackus-Carlson was suffering from Schizotypal Personality Disorder which was complicating treatment of Bipolar Disorder.

68.     But in making that diagnosis, Ms. Carpenter did not cite what symptoms of Schizotypal Personality Disorder Mr. Flackus-Carlson were suffering from, or how he met the criteria for that personality disorder.

69.     On December 8, 2014, a detailed psychological assessment for Mr. Flackus-Carlson was completed by Benjamin K. Jurek, PsyD, LP, who noted that Mr. Flackus-Carlson was admitted to psychiatric hospitals multiple times.

70.     However, Dr. Jurek did not record the presence of any symptoms of schizophrenia, a psychotic illness, during any of these prior hospitalizations.

71.     Dr. Jurek noted the following: "[t]he Veteran…is planning to sign a lease for an apartment where he will live by himself later on the day of the interview. He is happy with his new living situation. He reported he does not have any current hobbies or activities he enjoys. However, he noted he used to like fishing in the past. He is unemployed, and last worked for his parents at their fishing resort this past fall and summer."

72.     This is in stark contrast to the concerns expressed by Mr. Flackus-Carlson, and the Plaintiff, less than a month earlier on November 14, 2014.

73.     Dr. Jurek identified that Mr. Flackus-Carlson was suffering from the following symptoms.

A. <u>Depression</u>: including depressed mood, anhedonia (inability to experience pleasure), fatigue, sleep difficulty, decision making difficulty, psychomotor agitation, decreased sexual drive.

B. <u>Anxiety:</u> Unable to control anxiety; anxiety related to a special mission; panic attacks; obsessive thoughts related to him being the "chosen one."

C. <u>PTSD</u>: re-experiencing symptoms of recurrent and involuntary distressing memories, infrequent nightmares, being emotionally upset at reminders, avoidance of thoughts, feelings and memories of trauma, avoidance of activities, people, places and conversations that remind him of the trauma, negative alterations in mood and cognition, persistently negative emotional state, markedly diminished interest in activities, feeling of detachment from others, hyperarousal symptoms of irritability, reckless or self-destructive behavior, exaggerated startle response and concentration difficulty.

74.   On December 11, 2014, Crystal Fritzlar, MSW, LICSW, met the Plaintiff and her husband at Plaintiff's request.

75.   Ms. Fritzlar noted within the record: "Veteran's mother expressed concerns with the veteran living independently as in the past year she has had to take on the role of a caretaker or 'nurse' after hospitalizations to ensure this veteran was safe and taking his medications."

76.   On December 18, 2014, Justin Wirth, RN, evaluated Mr. Flackus-Carlson for participation in the Mental Health Intensive Case Management (hereinafter "MHICM") program.

77.   He determined that Mr. Flackus Carlson did not meet criteria to participate in MHICM because Mr. Flackus-Carlson had previously demonstrated that he could not reliably participate in group therapy due to attendance issues and oversleeping.

78.     Mr. Justin Wirth, RN, opined that Mr. Flackus-Carlson would be better treated in an inpatient treatment program.

79.     On December 19, 2014, Mr. Flackus-Carlson was evaluated by Susan Sawyer-Demaris, CNP, who noted that veteran was planning to move into his own apartment.

80.     This is in stark contrast to Mr. Wirth's determination the previous day that Mr. Flackus-Carlson needed to remain in an inpatient treatment program.

81.     On December 23, 2014, Mr. Flackus-Carlson was assessed for his suitability for the Psychological Recovery and Rehabilitation Center (hereinafter "PRRC") program.

82.     On December 29, 2014, Ms. Fritzlar, MSW, LICSW, noted that Mr. Flackus-Carlson made significant progress towards his treatment goals.

83.     However, clinical notes from the treatment team indicated that Mr. Flackus-Carlson did not attend or participate in the PRRC groups due to excessive daytime sleepiness.

84.     Also on December 29, 2014, it is recorded that Mr. Flackus-Carlson was discharged to his recently rented apartment.

85.     On December 30, 2014, Mr. Flackus-Carlson was interviewed by Nicholas Mowes, MSW, ASW.

86.     Mr. Flackus-Carlson reported that his ziprasidone was not effectively treating his delusions.

87.     However, by definition, Mr. Flackus-Carlson was not, in fact, suffering from delusions because Mr. Flackus-Carlson understood that his thoughts are fictitious.

88.     On January 2, 2015, Mr. Flackus-Carlson's treatment team cosigned a treatment plan.

89.     The note for January 2, 2015, stated that the Mr. Flackus-Carlson wanted to remain in an inpatient setting when he said: "I prefer to stay here as long as it takes," However, at this time Mr. Flackus-Carlson had already been discharged from inpatient treatment.

90.     On January 2, 2015, Mr. Flackus-Carlson was a no-show for his 1:00pm group.

91.     When contacted by Crystal Fritzlar, Mr. Flackus-Carlson reported paranoid thoughts centered around his fear that a friend was going to rape him.

92.     On January 7, 2015, Ms. Sawyer-Carlson met with his psychiatric provider and noted that he was still suffering from delusional thoughts.

93.     As previously discussed, Mr. Flackus-Carlson's awareness that his thoughts were fictitious runs counter to the definition of a delusion.

94.     Ms. Sawyer-Demaris changed Mr. Flackus-Carlson's medication placing him on two mood stabilizers Depakote ER and Gabapentin, the antidepressant Zoloft, and two antipsychotics, Ziprasidone and Haldol.

95.     On January 8, 2015, Mr. Flackus-Carlson missed group treatment sessions.

96.     On January 9, 2015, Mr. Flackus-Carlson visited with Elizabeth Gray, MSW, LICSW, and informed her that he was groggy.

97.     On January 13, 2015, Mr. Flackus-Carlson again missed group therapy due to oversleeping.

98.     On January 14, 2015, a clinical note authored by Ellen Manthe, RN, C-FNP, noted no overt psychosis, and no evidence of delusions in Mr. Flackus-Carlson's thinking.

99.     On January 20, 2015, Mr. Flackus-Carlson reported to Elizabeth Gray, LICSW, that he was returning to school with a goal of obtaining his master's degree in Marriage and Family Counseling at St. Cloud State University.

100.    Ms. Gray noted that there was no psychosis or schizophrenia present.

101.    On January 25, 2015, a mental health triage note indicated that Mr. Flackus-Carlson had made suicidal statements after getting intoxicated on alcohol, had blacked out, and blew 0.50 on a breathalyzer test.

102.    Mr. Flackus-Carlson's relapse on alcohol was less than one-month post discharge.

103.    On January 26, 2015, the day after making suicidal statements and blacking out, Susan Sawyer-Demaris, CNP, decided that Mr. Flackus-Carlson was at low risk for self-harm.

104.    On January 27, 2015, Mr. Flackus-Carlson no-showed for a scheduled clinic appointment.

105.    On January 28, 2015, two days after being found a low risk for suicide, the suicide risk assessment conducted by Elizabeth Gray noted that hopelessness, alcohol or drug use, withdrawal from friends, anxiety agitation, sleep problems were noted as suicide risk behaviors Mr. Flackus-Carlson exhibited.

106.    Despite exhibiting these behaviors, Mr. Flackus-Carlson was regarded as a low risk for suicide.

107.    On February 3, 2015, Mr. Flackus-Carlson no-showed for group therapy.

108.    On February 5, 2015, Mr. Flackus-Carlson reported to Ms. Sarah Meisinger, LICSW, that he had been drinking alcohol.

109.    Also on the same day, Mr. Flackus-Carlson failed to attend group therapy.

110.    On February 17, 2015, Mr. Flackus-Carlson was assigned a new case manager – Leah Martin, MSW.

111.    On February 17, 2015, Mr. Flackus-Carlson was assigned a new psychiatrist, Shashi Prakash, MD.

112.    Dr. Prakash noted Mr. Flackus-Carlson's previous diagnosis contained within the chart and interviewed Mr. Flackus-Carlson in person.

113.    Dr. Prakash noted that Mr. Flackus-Carlson had been attending PRRC treatment groups, a fact not supported by treatment group records.

114.    Dr. Prakash increased Mr. Flackus-Carlson's Depakote to 1500mg, increased the Haldol prescription five-fold to 5 mg, three times per day, added Cogentin to treat the side effects of Haldol, and continued his Ziprasidone.

115.    On February 24, 2015, Leah Martin tried to contact Mr. Flackus-Carlson by phone, but he did not pick up.  Mr. Flackus-Carlson also did not attend his PRRC appointment.

116.    On February 27, 2015, Ms. Leah Martin called Mr. Flackus-Carlson twice to pick him up for his appointment, but Mr. Flackus-Carlson did not pick up.

117.    On March 2, 2015, Leah Martin noted that she was unable to reach Mr. Flackus-Carlson.

118.    On March 4, 2015, Elizabeth Gray, LICSW, noted that PRRC staff had tried to contact Mr. Flackus-Carlson to no avail.

119.    On March 5, 2015, Mr. Flackus-Carlson did not attend his scheduled group therapy session, and the staff was not able to reach him by phone.

120.    On March 11, 2015, Mr. Flackus-Carlson was seen by Dr. Prakash, who again increased his Haldol to 10mg twice per day, but decreased his Zoloft prescription to 100mg out of concerns for agitation.

121.    On March 12, 2015, Ms. Leah Martin documented that Mr. Flackus-Carlson could not be reached by phone.

122.    On March 16, 2015, Ms. Leah Martin spoke with Mr. Flackus-Carlson by phone. Mr. Flackus-Carlson stated in that phone call that he had been drinking all night and had not slept.

123.    On March 19, 2015, Mr. Flackus-Carlson again reported that he had been drinking.

124.    On March 20, 2015, Mr. Flackus-Carlson met with Elizabeth Gray, LICSW, who documented that Mr. Flackus-Carlson had been drinking the night before.

125.    A suicide assessment noted that Mr. Flackus-Carlson had the following warning signs for suicide: Hopelessness, increasing alcohol and/or drug abuse, withdraw from friends and family, anxiety and agitation, and sleep disturbance. However, Mr. Flackus-Carlson was again judged to be a Low Risk for suicide at that time.

126.    On March 25, 2015, Mr. Flackus-Carlson met with both Ms. Martin and Dr. Prakash. Ms. Martin noted no overt signs of psychosis, while Dr. Prakash noted that Mr. Flackus-Carlson 'continued' to struggle with command hallucinations.

127.    On March 26, 2015, Mr. Flackus-Carlson was discharged from the PRRC program at St. Cloud VAMC.

128.    On April 2, 2015, Mr. Flackus-Carlson reported he had consumed eight beers in five hours the night before and wanted to be prescribed Antabuse.

129.    On April 8, 2015, Mr. Flackus-Carlson met with Lynn Arlt, MSW, LCSW, MA, for individual psychotherapy.

130.    On April 9, 2015, Mr. Flackus-Carlson met with Lynn Arlt, MSW, LCSW, MA, who noted that he had been heavily drinking that night before but that he did not display any delusions or hallucinations.

16

131.   On April 10, 2015, Mrs. Martin observed "No overt psychosis observed. Alcohol use is evident today and supported by Jeremy's admission of drinking earlier in the day. Later the same day, Dr. Prakash noted that Mr. Flackus-Carlson was still suffering racing thoughts and hears voices at a time which are symptoms of psychosis.

132.   Mrs. Martin's note and Dr. Prakash's note are inconsistent with each other.

133.   On April 14, 2015, Ms. Leah Martin spoke with Mr. Flackus-Carlson on the phone and noted that Mr. Flackus-Carlson had traveled north to be with family.

134.   On April 22, 2015, Ms. Leah Martin documented an interdisciplinary plan of care, but no discussion of suicide risk was documented in the plan.

135.   On May 4, 2015, had a follow-up appointment with Dr. Prakash.

136.   Mr. Flackus-Carlson's serum Depakote level was within the therapeutic range, yet Dr. Prakash increased the dosage to 2000mg at bedtime.

137.   On May 15, 2017, Mr. Flackus-Carlson was brought to Urgent Care at the St. Cloud VAMC after consuming an unknown number of Vicodin pills.

138.   Wanda Wirth, RN, noted that Mr. Flackus-Carlson displayed numerous warning signs for suicide including a plan to commit suicide by overdose.

139.   Melissa Barry, MD, recorded the following: "Jeremiah took an unclear number of Vicodin (7 or 27 was possible) in an attempt to get high. He heard voices, believing he will be a famous man. He told his mother he thought he was going to die and was brought to [sic] hospital."

140.   Upon admission, Mr. Flackus-Carlson had a toxic level of acetaminophen (A component of Vicodin), in his system and his liver function was compromised.

141.   Mr. Flackus-Carlson had to be revived by Narcan because of the large number of Vicodin he consumed.

142.    On May 18, 2015, Mr. Flackus-Carlson was admitted to the St. Cloud VAMC Inpatient Mental Health Unit.

143.    Dr. Jaya Varma, M.D., noted: "As per the initial medical records obtained and reviewed from Saint Cloud Hospital, the patient was admitted for OD (overdose) on Vicodin in an attempt to get high."

144.    On May 19, 2015, Jinae Plumhoff, RN, noted that Mr. Flackus-Carlson was displaying numerous warning signs of suicide, but was rated a "moderate suicide risk."

145.    Also on May 19, 2015, Mr. Flackus-Carlson was informed "of the possibility of a VA fiduciary [being appointed] if he continues to use VA funds to purchase drugs."

146.    Despite this warning, there is no indication in the veteran's VA claims file that a VA fiduciary was ever proposed or appointed.

147.    Despite knowledge from as early as December 9, 2014 that Mr. Flackus-Carlson's MMPI-2 profile, administered as part of a neuropsychology interview for RRTP placement, indicated that he was easily overwhelmend and incapable of managing current circumstances, the St. Cloud VAMC never took action to safeguard the veteran's VA funds.

148.    Mr. Flackus-Carlson was further admonished by Dr. Varma on May 19, 2015, that he needs "to use his VA funds appropriately. Otherwise, the patient's Mental Health Treatment Team will assign him a VA fiduciary to mange his VA funds or finances."

149.    This threat was made despite clear and unambiguous rules that do not allow VA medical providers to assign fiduciaries to manage funds.

150.    On May 20, 2015, Teresa Voigt, RN, noted that Mr. Flackus-Carlson was assessed as a "moderate risk" for self-harm.

151.    Later that same day, Virginia Neal, LCSW, had a conversation with Mr. Flackus-Carlson, wherein plaintiff expressed the following concern: *"Mother said she was concerned about

a veteran returning to his home alone. Stated that she is open to having veteran stay with her, but that veteran often becomes taxing to her due to her need for care on the resort. Cynthia stated that she would like to see veteran engage in RRTP but is aware that he is not open to this."

152.    Also within the same clinical note, Mrs. Neal recorded: "Discussed high risk for suicide flag that will require weekly appointments as well as how veteran said that he would like to continue therapy within the VA. Cynthia said that while talking with [the] veteran, yesterday veteran admitted to often taking more medication than prescribed in order to rid of auditory hallucinations."

153.    Ms. Neal further noted: "Cynthia shared concerns about veteran not addressing his MST [Military Sexual Trauma] and how she feels such issues also result in a cycle of isolation, harm to self and drug use/abuse. [sic] Writer discussed veteran's need for coping skills and communication with his treatment team in order to understand better the concerns before MST can be fully addressed. Cynthia agreed and said that she just wanted to fill in some of the holes that veteran may not have explained during staffing."

154.    On May 21, 2015, Mr. Flackus-Carlson was evaluated by psychiatrist Jaya Varma, MD. Her mental health note on this date was an exact copy of her note from the previous day. No updates about Mr. Flackus-Carlson's clinical condition were noted.

155.    On May 22, 2015, Mr. Flackus-Carlson was discharged from his 72-hour hold despite the treatment teams own assessment that Mr. Flackus-Carlson was a moderate risk for suicide.

156.    On May 26, 2015, Mr. Flackus-Carlson reported he had relapsed on alcohol less than a week after his discharge.

157.    On May 29, 2015, Mr. Flackus-Carlson admitted to Leah Martin that he had been drinking to the point of vomiting the night before.

158.    Later the same day, Dr. Prakash evaluated Mr. Flackus-Carlson and noted that he was still abusing alcohol and had a recent overdose due to taking Vicodin.

159.    On June 1, 2015, Leah Martin met with Mr. Flackus-Carlson to wish him a happy birthday.

160.    Ms. Martin discussed the reduction and refusal techniques to mitigate alcohol abuse, as Mr. Flackus-Carlson admitted he would likely go to the bar in the evening.

161.    On June 4, 2015, Ms. Leah Martin documented that Mr.Flackus-Carlson had been at the bar the night before, and stayed after closing time.

162.    On June 11, 2015, Mr. Flackus-Carlson missed his supported employment program appointment.

163.    On June 23, 2015, Ms. Leah Martin picked up Mr. Flackus-Carlson to pick him up for his appointment.

164.    Ms. Leah Martin noted that Mr. Flackus-Carlson's eyes were bloodshot and red.

165.    On June 23, 2015, Mr. Flackus-Carlson met with Dr. Prakash, who noted that Mr. Flackus-Carlson denied drinking since the last appointment he had with her.

166.    On June 23, 2015, Leah Martin reported having the following conversation with Cynthia Carlson: "Cynthia contacted [the] writer to discuss Jeremiah's medication management as she is unable to keep his excess meds with her and visit weekly to give Jeremiah his weekly mediset. Additionally, Cynthia would like the writer to know that she feels addressing Jeremiah's MST (Military Sexual Trauma) is important to his recovery. She also feels as though his psychotic symptoms may not be a result of schizophrenia, rather, they may have culminated as a result of his PTSD which was diagnosed due to his MST. Cynthia states Jeremiah's symptoms surfaced while in the Army, not before, that she attributes his psychosis to his MST and would like this addressed."

20

167.    On June 25, 2015, Mr. Flackus-Carlson overslept and admitted that he had been drinking the night before.

168.    On June 29, 2015, the interdisciplinary plan of care was updated. However, it is not clear what changes were made, as none of the issues had been changed from the previous plan.

169.    On June 30, 2015, Mrs. Martin documented that she had talked with Dr. Prakash about Mr. Flackus-Carlson's concerns regarding anxiety, and Dr. Prakash suggested that he be seen the next day.

170.    On July 1, 2015, a note read: "The patient states that he has been feeling more anxious, having the side effects from his medications in the form of restlessness. He states he sleeps fairly well. He had requested earlier for a one-to-one therapy and was referred for therapy assessment and has an appointment next week. The patient denies hearing any voices."

171.    On July 2, 2015, Cynthia Carlson again expressed her concern that the treatment team was not addressing Mr. Flackus-Carlson's PTSD and MST.

172.    On July 7, 2015,  Leah Martin noted she attempted to get ahold of Mr. Flackus-Carlson multiple times, but he did not respond.

173.    On July 7, 2015, Ms. Ashley Raden, Medical Support Assistant, noted that she had been unable to contact Mr. Flackus Carlson on the phone despite three attempts over the past five days.

174.    On July 9, 2015, Ellen Dinsmore, LIVSW, noted that Mr. Flackus-Carlson reported he was feeling depressed.

175.    On July 13, 2015, Chelsa Schmidt, RN, noted that Mr. Flackus-Carlson missed his mental health assessment.

176. Because Mr. Flackus-Carlson was flagged as a high risk for suicide, Mrs. Schmidt called to check on him.

177. On July 14, 2015, Mr. Flackus-Carlson was picked up by police and subsequently called Leah Martin from City Detox.

178. On July 16, 2015, Leah Martin recommended that Mr. Flackus Carlson participate in therapy.

179. On July 24, 2015, Mr. Flackus-Carlson reported that he had not consumed alcohol since his discharge from detox.

180. On July 29, 2015, Mr. Flackus-Carlson reported that he had been drinking again and was suffering from depression.

181. On July 30, 2015, Mr. Flackus-Carlson did not attend his appointment with Kari Harrum, VRS.

182. On August 5, 2015, Mr. Flackus-Carlson reported to Ms. Leah Martin that was drinking again, and he feels that his medications are not working correctly.

183. On August 11, 2015, Mr. Flackus-Carlson was oriented in all areas in a conversation with Ms. Martin.

184. On August 13, 2015, Kari Harrum, VRS, visited Mr. Flackus-Carlson who observed that he appeared as he had just woken up, had not showered, and smelled of body odor.

185. On August 13, 2015, Mr. Flackus-Carlson met with Dr. Prakash who increased his Zoloft to 150mg, discontinued oral Risperdal, and increased Risperdal intramuscularly.

186. On August 20, 2015, Mr. Flackus-Carlson met with Kari Harrum and reported that he is questioning the diagnosis of schizophrenia.

22

187.    On August 26, 2015, Mrs. Cynthia Carlson reported to Leah Martin that Mr. Flackus-Carlson was withdrawn and lacking motivation.  Plaintiff reported in that meeting that she would like for Mr. Flackus-Carlson to change psychiatrists.

188.    On August 28, 2015, Mr. Flackus-Carlson endorsed his mother's report that he lacked motivation.

189.    On August 31, 2015, saw Dr. Prakash Plaintiff who apparently read Mr. Flackus-Carlson's Disability Benefits Questionnaire (hereinafter "DBQ") and earlier diagnosis of PTSD and MST for the first time.

190.    On this date, Dr. Prakash changed Mr. Flackus-Carlson's diagnosis from Schizophrenia to PTSD but made no changes to the planned course of treatment.

191.    On September 3, 2015, Mr. Flackus-Carlson met with Ms. Martin and Ms. Harrum and reported he was feeling well because he had not been drinking recently, which was inconsistent with his statements to other providers.

192.    On September 4, 2015, Mr. Flackus-Carlson, informed Ms. Martin he felt "worthless."

193.    On September 10, 2015, Nancy Kirchner MSW, LICSW, documented an attempt to contact Mr. Flackus-Carlson to invite him to attend Dialectic Behavioral Therapy (hereinafter "DBT").

194.    On September 11, 2015, Ms. Martin noted that Mr. Flackus-Carlson's mood was stable and upbeat.

195.    On September 14, 2015, Mr. Flackus-Carlson received his scheduled Risperdal injection.

196.    On September 21, 2015, Ms. Martin noted that Mr. Flackus-Carlson had thoughts of becoming a model and save the world from his notoriety.

197.    On September 25, 2015, Ms. Kari Harrum, VRS visited Mr. Flackus-Carlson, and she reported that Mr. Flackus-Carlson was disheveled, dirty, wrinkled, and had not showered.

198.    On September 28, 2015, Ms. Leah Martin updated the interdisciplinary treatment plan but it contained contradictory information including a report that Mr. Flackus-Carlson was still in a locked ward.

199.    On September 29, 2015, Dr. Prakash he reported that Mr. Flackus-Carlson had not been drinking which was inconsistent with Mr. Flackus-Carlson's reports to other providers.

200.    On October 2, 2015, Ms. Martin attempted to contact Mr. Flackus-Carlson but failed to reach him.

201.    Ms. Martin recorded that she thought he was sleeping.

202.    Also on October 2, 2015, the multidisciplinary team met and continued to flag Mr. Flackus-Carlson as a high suicide risk.

203.    On October 5, 2015, Ms. Leah Martin tried to call Mr. Flackus-Carlson at 1:00 pm, but he declined to meet with Ms. Martin.

204.    On October 6, 2015, Leah Martin completed a Suicide Risk assessment noting signs of a pending suicide attempt but assessing the risk as low.

205.    October 9, 2015, Kari Harrum, VRS, made multiple attempts to reach Mr. Flackus Carlson.

206.    Mr. Flackus-Carlson's death was recorded on October 11, 2016, at 4.57pm.

207.    Per the VA Self Directed Violence (SDV) Classification, this event was classified as "Non-Suicide Self Directed Violence Fatal."

208.    On October 12, 2015, Mrs. Mary Jo Pine, RN, Suicide Prevention Coordinator drafted a note "PRF High Risk for Suicide 90 Evaluation".

209.    This high risk for suicide note was drafted after Mr. Flakus-Carlson's death.

210.    On October 24, 2015, the high risk for suicide flag on Mr. Flakus-Carlson's file was inactivated.

211.    On January 11, 2016, in a suicide behavior note, Ms. Mary Jo Pine, RN, noted the following: "Veteran died in his apartment via an opiate drug overdose. [The] veteran had a history of opiate drug abuse which he obtained from unknown sources outside the health care system. Per death certificate, the Manner of Death was indicated an accident, and this is also the families belief [sic]."

## CAUSE OF ACTION

212.    Paragraphs 1 through 200 are realleged and incorporated by reference as if more fully set forth herein.

213.    Mr. Flackus-Carlson died as a result of negligent, substandard, and inadequate psychiatric care by the Department of Veterans Affairs generally, and the St. Cloud VAMC specifically.

214.    The St. Cloud VA owed a duty of care to Mr. Flackus-Carlson to treat him for his mental health conditions in accordance with generally accepted standards of care.

215.    Defendant breached its duty of care to Jeremiah Flackus-Carlson in the following ways including, but not limited to, the following:

a.   In failing to properly treat Jeremiah Flackus-Carlson;

b.   In failing to properly care for Jeremiah Flackus-Carlson;

c.   In failing to properly monitor Jeremiah Flackus-Carlson;

d.   In failing to properly diagnose Jeremiah Flackus-Carlson;

e.   In failing to properly prescribe medication for Jeremiah Flackus-Carlson;

f.  In failing to properly monitor medication prescribed for Jeremiah Flackus-Carlson;

g.  In failing to accurately record medical treatment in a timely and accurate fashion.

h.  In failing to appoint a Department of Veterans Affairs fiduciary in order to prevent the veteran from using VA funds to purchase drugs.

i.  In failing to seek a guardianship or conservatorship over the veteran.

j.  In failing to abide by their own regulations, policies, and procedures regarding medical and administrative management of mental health patients.

216.    At all times mentioned, the employees, agents, and /or representatives of the United States Government were negligent and proximately caused Jeremiah Flackus-Carlson's untimely death.

217.    As an actual and/or proximate cause of Defendant's breach of duty to provide care, Jeremiah Flackus-Carlson wrongfully died.

218.    Under the Federal Tort Claims Act, Defendant United States of America is liable for their negligent acts, and inaction.

Wherefore, Plaintiff respectfully requests:

A.  Compensatory damages from Defendant in the amount of $10,000,000 (Ten Million Dollars).

B.  Reasonable Attorney's fees and costs from Defendant.

C.  Such other and further relief as may be deemed appropriate.


Dated: _____          _s/Brian Lewis_____
                                       Brian K. Lewis
                                       MN Atty. Reg. No. 0398886
                                       Attorney for Plaintiffs
                                       Francis White Law, PLLC
                                       8362 Tamarack Village, Suite 119-220

Woodbury, MN 55125
(651) 829-1503
Brian.lewis@franciswhitelaw.com